## Crider et al. v. Crum.

## Same v. Same et al.

(Decided March 14, 1930.)

M. C. KIRK, W. R. McCOY and ED C. O'REAR for appellants.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

The two above-styled cases were tried together in the lower court and in this court and will be disposed of by this opinion. These two suits were filed in the fall of 1914, and pursued a leisurely course until the spring of 1924, when they were finally submitted. Judgment was rendered in the spring of 1927, but this appeal was not taken until January, 1929. No explanation appears in the record for the long delay in the preparation and trial of these causes.

In 1865, James Crum deeded to the Honorable John G. Carlisle a tract of land in Martin county containing approximately 371 acres, and which we shall call in this

opinion "the Carlisle tract." By mesne conveyances this tract has come into the ownership of the four appellants; the surface being owned by the appellant Martin County Land Company, the oil and gas rights by the appellant Margaret Oil & Gas Company, the timber rights by the appellant S. M. Crider, and the coal and mineral rights other than gas and oil by the Consolidation Coal Company. For the sake of convenience, however, we shall treat all of these various appellants as one and as though all these various rights were centered in one ownership. The Carlisle tract roughly resembles a horseshoe, with the toe of the shoe pointing to the east. The outline of the horseshoe represents a ridge running from one heel of the shoe to the other heel and surrounding a hollow in the bottom of which, and flowing westwardly, is a creek known as "the left fork of Big Peter Cave Fork." This creek passes out of the hollow formed by these ridges between the two heels of the horseshoe and finally empties into the middle fork of Rockcastle creek. The beginning point in the deed of James Crum to John G. Carlisle is located on the northern side of the horseshoe at some little distance from that heel. All of the surveyors who testified in this case, both those for the appellants and those for the appellees, agree that the boundary of the Carlisle tract running from this beginning point around the toe of the horseshoe to a point near the southern heel is well marked and well defined and could easily be run on the ground from the description found in the Carlisle deed. At this point on the southern side of the horseshoe, the trouble begins. This point is designated in the call in the Carlisle deed as "a hickory on top of a ridge." The next four calls in the Carlisle deed are as follows: "North 21 west 18 poles to a chestnut; north 1 west 18 poles to a hickory; north 65½ west 54 poles to a chestnut oak on a hillside; north 8 degrees east 140 poles crossing Big Peter Cave to a knob on the fork ridge of Little Peter Cave Branch." And the dispute in the suit of Meredith Crum et al. against the appellants, which is a suit to quiet title, turns on the correct locations of these calls. The dispute arises thus: Twenty years after James Crum had deeded the Carlisle tract to John G. Carlisle, he deeded a tract of land lying immediately to the west of the Carlisle tract to, as the deed designates him, "old man Adam Crum." Where the tract thus conveyed to Adam Crum binds on the Carlisle tract, the description in the deed to Adam Crum is

"thence with John G. Carlisle's line, to a large rock in the edge of Big Petre (sic) Cave Branch, thence with said line to the top of the fork ridge of Big Petre (sic) Cave." By mesne conveyances this Adam Crum property has come into the ownership of the plaintiffs in the Meredith Crum et al. suit. Now the Meredith Crum suit depends on where the Carlisle line running between the two heels of the horseshoe, and which is a line common to both the Carlisle tract and the Adam Crum tract, is to be located. Appellees contend for a location considerably to the east from the location for which the appellants contend. The area covered by the dispute is a little over 32 acres. So much for the present as to the Meredith Crum suit. Turning now to the George Crum suit, we find that in 1904 George Crum and others procured from the state of Kentucky a patent for 35 acres of land lying within the description of the Carlisle tract and approximately at the toe of the horseshoe. By mesne conveyances the tract covered by this patent has come into the ownership of the appellee George Crum. The dispute in his suit, which is also a suit to quiet title, is as to the superiority of his title under this patent to the land covered by it over the title of the appellants under the Crum to Carlisle deed. The disputes in both of these appeals came to a head in these suits in this fashion. The appellant Crider, claiming the right to cut the timber on the Carlisle tract, began to cut down trees on the two disputed areas. Thereupon these two suits were brought to restrain him from further cutting the timber on those areas and to quiet the respective titles of the plaintiffs to the respective areas. In due course of time all of the appellants were made parties defendants. All of them filed their answers and counterclaims traversing the claims of the plaintiffs, setting up their respective claims to ownership in the tract of the rights heretofore mentioned, and asking that their titles be quieted. Subsequent pleadings made up the issues, and after proof heard the court awarded the plaintiffs the relief they sought in their respective suits, and from those judgments these appeals are prosecuted.

## THE GEORGE CRUM SUIT.

This suit may be quickly disposed of. Section 4704 of the Kentucky Statutes, being a part of the law governing the patenting of the vacant and unappropriated lands of this commonwealth, provides: "None but vacant land shall be subject to appropriation under this chapter.

Every entry, survey, or patent made or issued under this chapter shall be void, so far as it embraces lands previously entered, surveyed, or patented.''

The evidence in this case tends strongly to establish that two-thirds of the land embraced within the patent obtained by George Crum and others in 1904 is embraced in previous and earlier patents. Even the surveyor West, who testified for the appellees, admitted that a portion of this 1904 patent was embraced within the Reuben Crum patent of 1852 for 150 acres. But be that as it may, it is admitted that all of the land covered by this 1904 patent is embraced within the Carlisle tract, which was a tract of land having well-defined boundaries, although the location of one of its lines was in dispute since the location of that line, whether as appellees contended, or as appellants contend, would not affect the area of the Carlisle tract in so far as it embraced the area comprised within the 1904 patent. In the case of War Fork Land Co. v. Llewellyn, 199 Ky. 607, 251 S. W. 663, 665, the facts were these: The War Fork Land Company had purchased from R. L. Thomas and others the tract of land in dispute in that litigation, and thereafter had removed the timber from portions of the tract and had regularly listed it for taxation. The lines around the tract were well marked and its boundary was well defined. The deed for the tract was of record. Thereafter Llewellyn undertook to obtain a patent from the commonwealth for the tract in question. In the litigation between the War Fork Land Company and Llewellyn, the company did not prove its title to the tract, title to which was in issue in the suit, back to the commonwealth, nor so far as the statement of facts in the case discloses beyond the Thomas deed. In considering whether the tract in dispute was subject to being patented by the appellee, and in holding that, under section 4704 of the Statutes above quoted, it was not, we said: ''The statutes do not subject any lands to appropriation the title to which is in the state nor any lands not previously entered, surveyed, or patented, but only vacant lands. The word 'vacant' as ordinarily understood means 'unoccupied.' Here appellant was in possession of the land under color of title at the time appellee's entry was made. Its deed was of record, and the very purpose that the Legislature had in view in respect to vacant lands had been previously accomplished by appel-

lant as to this tract. If land for which a void patent has been issued by the state cannot thereafter be patented as vacant land, and if the intention to settle and improve land, as evidenced by an entry and survey, excludes it from the statutory definition of vacant and unappropriated lands, certainly land occupied by one who claims to a well-defined boundary under color of title cannot be regarded as vacant and unappropriated within the meaning of the Statutes. It follows that the patent issued to appellee is void.''

In this case the deed of James Crum to John G. Carlisle for the Carlisle tract and the deeds for the mesne conveyances were of record and had been so long prior to the time when the patent of 1904 was procured. The owners of the Carlisle tract had regularly paid taxes upon the same. As we have seen, the boundary around the tract was well marked and well defined, and the record shows very conclusively that those who procured the patent of 1904 knew that the land for which they were undertaking to obtain a patent lay within the description of the Carlisle tract. The owners of the Carlisle tract in 1904 held it at least under color of title. The record further shows that a number of years ago Mr. Carlisle took actual possession of the Carlisle tract by placing tenants upon the same, who thereafter lived upon the tract claiming to its boundaries for Mr. Carlisle and who looked after the property for him. Mr. Carlisle was thus in the ownership and possession of this tract at the time the 1904 patent was procured. Under these facts and the War Fork Land Co. case, supra, the land embraced in the 1904 patent was not vacant land at the time that patent was issued. Hence that patent was void, and since it was all that supported the claim of George Crum in his suit to the land embraced in that litigation, the court erred in awarding him the judgment it did.

## MEREDITH CRUM ET AL. SUIT.

As to the area in dispute in the Meredith Crum et al. suit, a more detailed discussion of the evidence than we have heretofore given is neccessary to arrive at a correct solution of the problems presented in that litigation. It will be remembered that no difficulty was encountered in running the calls of the Carlisle deed until a point on the southern heel of the horseshoe was reached. The last call run without difficulty was ''North 80 west 95 poles to a hickory on top of a ridge.'' We have heretofore

given the next three calls, each of which terminates at a tree. To run these three calls just as the deed reads, we must leave the top of the ridge around which the boundary had run and start down the hillside towards the hollow. At the end of each call no tree, object, or monument is found and the last of these three calls crosses the ridge to the side opposite the hollow. In order to get from the end of this third call as thus run over to the "Knob at the fork ridge of Little Peter Cave," which is the terminus of the next call in the Carlisle deed, both the course and distance of that call have to be changed from north 8 degrees east 140 poles to north 19 degrees 30 east 190 poles. It may be said in passing that if this call be thus changed, it will pass what we shall call "a small rock" in the left fork of Big Peter Cave fork. When the surveyors who were appointed by the court in this litigation to make a survey of this Carlisle tract undertook to run its calls, they discovered the difficulties of these three calls ending at no tree though they called for trees, of lines leaving the top of the ridge and running down the hillside towards the hollow, and of the lines then crossing the ridge twice. Ordinarily in these mountain deeds the lines run with the top of the ridges. So they conferred with James Crum, the grantor of the Carlisle deed and who was then still living though a very old man, about where these lines should be located. He told them that if they would go to a large rock in the left fork of Big Peter Cave fork, and then would run the call north 8 degrees east at 40 poles, they would find the "chestnut oak" called for by the last of the three calls we have mentioned. This the surveyors did. According to the testimony of the surveyors Richmond and Williamson, the latter of whom, however, in a later deposition weakly retracted his approval of the map filed as a result of their survey and of the report he had signed and filed with the court as to this survey, they did find the chestnut oak just 40 rods up the hill from this large rock on the course called for in the Carlisle deed with some slight change to take care of the variation of the needle. It is true that in a later deposition, Williamson said that this chestnut oak was found about 38 poles up from the large rock; but, at all events, the proof shows that it was found practically on top of the ridge, the southern heel of the horseshoe. By reversing the three calls in question and running them from this chestnut oak with some variation in the courses

but along the top of the ridge, marked trees were found at the end of each of the calls, and they led back to the undisputed "hickory on top of a ridge." Coming back now to the chestnut oak which James Crum identified as the corner of the call "North 65½ West," and running the next call of the deed "North 8 degrees east 140 poles" with a slight change in the course to take care of the variation of the needle, we find that the line as thus run reaches from the southern end of the horseshoe across the hollow, to the top of the ridge represented by the northern heel of the horseshoe, the line crossing the left fork of Big Peter Cave fork by a large rock in the edge of that stream and terminating on the northern ridge at a "white oak." It is agreed, however, that this white oak is not the "knob at the fork ridge of Little Peter Cave," the terminal called for by this call of the Carlisle deed, and that in order to get from this white oak to the "Knob of fork ridge of Little Peter Cave" along this northern ridge, a call has to be inserted. However, when this call is inserted there is found along it well-marked trees indicating a boundary line. James Crum testified that this inserted call had been left out of the Carlisle deed, the original of which has long since been lost, either through an error in copying the notes of the surveyor who laid out the Carlisle tract, or through an error of the clerk who recorded that deed in the county clerk's office in failing to copy the call. In the deed that James Crum made to "old man Adam Crum," and to which the appellees trace their title to the disputed area, the description of the property conveyed runs to the fork ridge of Little Peter Cave at J. D. Kirk's line and, to quote from that deed, "thence with John G. Carlisle's line to a large rock in the edge of Big Peter Cave Branch, thence with said line to the top of fork ridge of Big Peter Cave." Later one of the mesne grantees of this tract, under whom appellees claim, conveyed the minerals thereunder to the Honorable John C. C. Mayo, and in that mineral deed there is this description of the tract: "Up the branch north 82 degrees east 12 poles to a stake opposite Noah Crum's house; south 87 degrees east 10 poles to a large rock in the branch on J. G. Carlisle's line and with the same up the hill north 8 degrees east 74 poles to a *White oak* on top of the ridge between Big Peter Cave and Little Peter Cave branches on W. B. Preece's line."

From this deed it will be noted: First, that the large rock in the branch is stated as being close to a stake opposite Noah Crum's house. The evidence very satisfactorily establishes that this house of Noah Crum was the one near the big rock and not near the little rock. Secondly, the description in this mineral deed calls for Carlisle's line up the hill to a *white oak* on the top of the ridge, and this is the white oak on the northern heel of the horseshoe which was reached by running the call in the Carlisle deed from the chestnut oak as located by James Crum on the southern heel of the horseshoe to the northern heel, according to the call of the Carlisle deed, north 8 east 140 poles. The appellees undertake to avoid the effect of this mineral deed by producing the grantor in that deed, who testified that he did not intend by that deed to convey to Mayo the mineral rights under all his land, but just under 40 acres and 4 poles, but the deed itself recites to the contrary. It reads: "It is the intention of the parties of the first part (the grantors) to convey and they do hereby convey the mineral rights and privileges as enumeated (sic) above in, on and under all of the land owned by them in this locality whether embraced in either of the foregoing descriptions or not."

James Crum testified that he never intended nor did he convey by his deed to "old man Adam Crum" any land above the big rock in the left fork of Big Peter Cave fork. Moreover, the evidence shows that Noah Crum, one of the appellees herein, when he wished to live upon the land in dispute, secured written permission to do so, from Mr. Carlisle's representative who had the Carlisle tract in charge; that "old man Adam Crum" and his subsequent grantees, although they cut the timber from the tract deeded to "old man Adam Crum" by James Crum, never went above the large rock in the left fork of Big Peter Cave fork; that an old rail fence was found on the line between the big rock and the chestnut oak. A great deal of other evidence was introduced by both sides, as, for instance, that of appellants to the effect that the appellees and their grantors, immediate and remote, had pointed out to appellant Crider, when he was about to buy the timber rights on the Carlisle tract, the big rock as being in the Carlisle line, and admissions made by one of these grantors who ran a water mill that the big rock was in the Carlisle line, but all this was denied by the appellees. We will not go into an analysis of this other evidence as the facts which we have detailed

above and concerning which there is either no dispute or, where questioned, are overwhelmingly established by the evidence is sufficient to decide this case.

From this resume of the evidence, we find that to run the calls of the Carlisle deed literally will not close the boundary. Both sides admit that some mistake was made in these calls. The appellees would correct that mistake by changing the course and distance of the call which crosses the hollow from the southern heel of the horseshoe to the northern heel. But to do this, the three previous calls have to be run so as to meet no "called for" objects, to leave the top of the southern ridge and later to cross it twice in a very uncustomary manner. To locate the Carlisle tract thus ignores the evidence of the calls in the deed of "old man Adam Crum" and the mineral deed to Mayo, ignores the evidence of James Crum, the common grantor of the parties to this litigation, as to the boundaries of the Carlisle tract and its corners, ignores the evidence of the conduct of the appellees and their grantors immediate and remote. To correct the mistake, as appellants insist should be done, would make the calls reach monuments and natural objects, would locate the lines as James Crum said they should be, would be in accordance with what would naturally be expected of surveys of land of this character, would be entirely consistent with the description in "old man Adam Crum's" deeds, and with the conduct of him and the subsequent grantees of the tract. The mind is irresistibly led to the conclusion that the evidence sustains the appellants in their contentions rather than the appellees. In the case of Rogers Bros. Coal Company v. Roberts, 216 Ky. 214, 287 S. W. 725, 726, we said: "The object of all rules for the establishment of boundaries is to ascertain the actual location of the boundary as made at the time."

In Morris v. Jody, 216 Ky. 593, 288 S. W. 332, 333, we said: "All of the rules of law that have been adopted for guidance in locating disputed boundary lines have been to the end that, in so doing, the steps of the surveyor who originally projected the lines on the ground may be retraced as nearly as possible. No rule that has been adopted to accomplish that end is more firmly established than that courses and distances are controlled by marked corners and fixed monuments."

In Bentley v. Napier (Ky.) 122 S. W. 180, 182, we said: "Parol proof is always admissible to show where

the objects called for in a deed are located on the ground.''

Applying these principles to the evidence before us, we are of the opinion that the method of the appellants in correcting the mistake in the calls of this Carlisle deed was the proper one to be applied and that, when so applied, the case of the appellees falls.

We have not overlooked the plea of adverse possession relied upon by both sides in both suits. As to that of the appellees in the first of these two cases, not only is no real pretense of an adverse holding made by them in the record, but the requisite time for an adverse holding to ripen into title had not elapsed between the procurement of the 1904 patent and the assertion of title by the appellants in that suit. As to such claim by the appellees in the second suit, the evidence fails to show at least an adverse holding for the statutory period.

At to appellant's counterclaims in the second suit, the parties trace their title to the disputed land to a common grantor. We have seen that the title of the appellants is superior to that of the appellees. In the first suit, we have seen that the appellees have no title to the disputed area, and the proof satisfactorily establishes title to it in the appellants at least by adverse possession. Therefore, on their counterclaim, the appellants should have had their title to the disputed areas quieted as to the claims of the appellees in the respective suits.

Wherefore the judgment in each case is reversed, with instructions to dismiss the petitions of the appellees and to quiet the title of the appellants in the disputed tracts as against the claims of the appellees.